SANDEEP KANCHERLA,

                    Plaintiff,                    Civ. No. 14-7784 (KM)

v.                                                        OPINION

LINCOLN TECHNICAL INSTITUTE,
INC., JOHN DOES 1-5, JANE DOES
1-3, and ABC CORPS. 1-10
(fictitious names representing one
or more unknown defendants)

                    Defendants.

KEVIN MCNULTY, U.S.D.J.:

The plaintiff, Sandeep Kancherla, is a former employee of defendant Lincoln Technical Institute, Inc. ("Lincoln"). Kancherla contends that Lincoln should be liable under the Family Medical Leave Act ("FMLA") for retaliation and interference, 29 U.S.C. § 2615(a)(1),(2), and liable under the New Jersey Law Against Discrimination ("NJLAD") for discrimination and retaliation, N.J.S.A. 10:5–12(a), (d).

Now before the Court is Lincoln's motion for summary judgment as to all claims under both counts. For the reasons discussed below, Lincoln's motion is for the most part denied. It is granted as to Count 1, to the extent Count 1 asserts an interference claim under the FMLA. I also grant Lincoln's request to strike Kancherla's demand for punitive damages under the FMLA.

# TABLE OF CONTENTS

I.   Background.............................................................4
     A. Procedural History.............................................4

     B. Relevant Facts..................................................5
          1. Kancherla's Employment with Lincoln.................5
          2. Relationship between Lincoln and CUnet............5
               i.    Purchase Orders: "Billing to Budget".........6
               ii.   Monthly Invoices and the Client Services
                     Agreement...............................................7
          3. Kancherla's Internal Complaints.....................7
          4. Lincoln's Audit of CUnet...............................7
          5. Kancherla's FMLA leave.................................8
          6. Lincoln's Internal Investigation......................9
          7. Lincoln's Decision to Terminate Kancherla.......11

     C. Disputed Facts.................................................12
          1. Violation of Lincoln's Policies.......................12
               i.    Marketing Department Internal Control Review
                     Summary................................................13
               ii.   Lincoln's Integrity Assurance Program- Code of
                     Business Ethics and Conduct................14
               iii.  Lincoln's General Conduct Guidelines.....14

          2. Other disputed issues.................................14

II.  Legal Standard......................................................14

III. Discussion...........................................................16
     A. FMLA Interference and Retaliation Claims (Count 1) ........16
          1. FMLA Interference Claim..............................17
          2. FMLA Retaliation Claim................................18
               i.    Ability to Return to Work.....................18
               ii.   *McDonnell Douglas* Burden-Shifting Framework......20
                     a) Kancherla's *prima facie* case of retaliation........21
                     b) Lincoln's legitimate non-discriminatory reason
                        for dismissal and Kancherla's proof of
                        pretext.............................................25

     B. NJLAD Disability Discrimination and Retaliation Claims (Count
        2)....................................................................27
          1. NJLAD Discriminatory Discharge Claim...............28

       i.     Kancherla's *prima facie* case of discriminatory discharge............................................................30

      ii.    Lincoln's legitimate non-discriminatory reason for dismissal and Kancherla's proof of pretext..............30

  2. NJLAD Retaliation Claim.......................................................31

C. Compensatory Damages and the After-Acquired Evidence Doctrine.....................................................................................32

D. Punitive Damages.......................................................................34

E. Backpay.....................................................................................35

IV.   Conclusion........................................................................................36

# I. Background[1]

## A. Procedural History

On December 15, 2014, Kancherla filed his original Complaint (Compl., ECF no. 1). On February 1, 2017, Kancherla filed an Amended Complaint against Lincoln Technical Institute, Inc. ("Lincoln") and fictitious defendants.[2] (AC, ECF no. 46). The Amended Complaint asserts claims of interference and retaliation under FMLA, 29 U.S.C. § 2615(a)(1),(2); discrimination and retaliation under NJLAD, N.J.S.A. 10:5–12(a),(d); and for hostile work environment under NJLAD, N.J.S.A. 10:5–12(a). On March 28, 2017, Kancherla and Lincoln filed a stipulation of dismissal with prejudice of the third, hostile work environment count (ECF no. 51).

On June 20, 2017, Lincoln filed a motion for summary judgment. (ECF no. 55). On August 14, 2017, Kancherla filed papers in in opposition. (ECF no. 61). On August 21, 2017, Lincoln filed papers in reply. (ECF no. 62)[3]

---

[1]     Record items cited repeatedly will be abbreviated as follows:

"AC" = Amended Complaint (ECF no. 46)

"Def. Br." =   Brief in Support of Defendant Lincoln's Motion for Summary Judgment (ECF no. 55)

"Pl. Opp." =   Plaintiff Kancherla's Opposition to Defendant Lincoln's Motion for Summary Judgment (ECF no. 61)

"Def. Reply" = Reply Brief in Further Support of Defendant Lincoln's Motion for Summary Judgment (ECF no. 62)

[2]     Defendant Lincoln Educational Services Corporation, erroneously named as a defendant in the original complaint, was terminated from the case.

[3]     On August 29, 2017, Judge Hammer granted Lincoln's motion to seal documents in support of its motion for summary judgment. (ECF no. 63). Some of the exhibits are therefore sealed, or are cited in their redacted form.

### B. Relevant Facts[4]

#### 1. Kancherla's Employment with Lincoln

On June 15, 2009, Plaintiff Kancherla began at-will employment as an Internet Marketing Manager for defendant Lincoln at its West Orange, New Jersey location. (DSMF ¶¶ 5, 7). Lincoln is a subsidiary of Lincoln Educational Services, which is "an educational institution with a network of 20 campuses in 14 states offering diploma, degree, and certificate programs in various skill trades." (*Id.* at ¶ 4). Kancherla's job responsibilities included managing the Internet budget, engaging in web media buying, setting up campaigns for web banner display advertising, overseeing current web vendors, and managing activities and communication of status and results. (*Id.* at ¶ 19). During most of his tenure at Lincoln, Kancherla reported to Mark Enea ("Enea"), the Director of Digital Marketing. (*Id.* at ¶ 18). However, in May and June 2013, Kancherla reported to Don Alava ("Alava"), Vice President of Digital Marketing. (*Id.*)

As for Enea, he reported to Alava. (*Id.*)(citing ECF no. 55-3, Exh. I at 14:24 to 15:10, 20:7 to :11). Alava, in turn, reported to Piper Jameson ("Jameson"), the Chief Marketing Officer. (*Id.*)

#### 2. Relationship between Lincoln and CUnet

In 2003, CUnet, LLC ("CUnet") was retained by Lincoln as a third-party vendor who would "provide internet lead management services, generat[e] internet traffic and leads with the intent to increase student acquisition at Lincoln's campuses nationwide." (*Id.* ¶¶ 21, 23). *See also* (PSSMF ¶ 1); (ECF no.

---

[4]     For purposes of this motion, I consider Defendant Lincoln's Statement of Undisputed Material Facts ("DSMF")(ECF no. 55-2), Plaintiff Kancherla's Responsive Statement of Undisputed Material Facts ("RSMF")(ECF no. 61-5), Plaintiff Kancherla's Supplemental Statement of Undisputed Material Facts ("PSSMF")(ECF no. 61-7), Defendant Lincoln's Response to Plaintiff Kancherla's Supplemental Statement of Undisputed Material Facts ("DRSSMF")(ECF no. 62-2), and Defendant Lincoln's Reply to Plaintiff Kancherla's Responsive Statement of Undisputed Material Facts ("DRRSMF") (ECF no. 62-1) pursuant to Local Rule 56.1, as well as the deposition testimony and documentary evidence. Facts not contested are assumed to be true.

61-2, Exh. C at 19:1 to :3). In particular, CUnet managed affiliates or pay per lead vendors who would "host and manage internet sites that capture[d] leads or potential students for Lincoln." (PSSMF ¶ 2). CUnet delivered those captured leads to Lincoln, and also had its own internet sites which captured leads for Lincoln. (*Id.*)

In the beginning of the Lincoln-CUnet relationship, Enea was responsible "for writing monthly purchase orders on Lincoln's behalf to be sent to CUnet and for approving monthly invoices received from CUnet for payment." (*Id.* at ¶ 3)(citing ECF no. 61-2, Exh. C at 23:4 to :23, 24:14 to 25:7, 125:7 to 126:10; ECF no. 61-2, Exh. D at 11:13 to 14:24). Subsequently, Egbavwe (known as "Jeff") Pela assumed that responsibility. (*Id.*) In 2012, Kancherla took over Pela's role and became responsible for managing Lincoln's account with CUnet, while Kimberly Kelly ("Kelly"), the Senior Vice President of Client Services for CUnet, and Joanne Malek ("Malek"), the Senior Account Executive for CUnet, were responsible for managing the account on behalf of CUnet. (DSMF at ¶¶ 20, 27, 29).

### i. Purchase Orders: "Billing to Budget"

The Lincoln Marketing Department had an internal procedure for allocating funding for "obtain[ing] lead generation services from third-party vendors," like CUnet. (*Id.* at ¶ 31). Kancherla would prepare monthly purchase orders based on Lincoln's annual budget for "services to be provided by CUnet in the following month." (PSSMF ¶ 14). *See also* (DSMF ¶ 36). The purpose of the purchase order was "'to provide a budget for the spend for a particular vendor for that month across different brands, schools, toward different initiatives that [Lincoln] ha[d] running with other vendors.'" (DSMF ¶ 35)(quoting ECF no. 59-5, Exh. B at 192:7 to :15).

Specifically for CUnet, the purchase order identified a dollar amount which "served as CUnet's budget to. . . spend for each campus for that particular month to deliver leads." (PSSMF at ¶ 15). Kancherla would sign the purchase orders; however, depending on the amount of the purchase order,

other Lincoln employees, like Enea and Jameson, would also sign off on the purchase order. (*Id.* at ¶ 14).

Once the purchase order was signed, Kancherla would e-mail it to Malek, thereby providing her with an allocated budget which was separated into categories for different campuses. (DSMF at ¶ 36). CUnet would then "'place the buys in order to get the lead flow set up. They would place money in their system, by vendor, and they would use that amount of money by campus as their guide.'" (*Id.*)(quoting ECF no. 61-2, Exh. C at 30:5 to :12).

This process— CUnet billing Lincoln for the entire amount of money in the allocated budget—is referred to as "billing to budget." It is to be distinguished from CUnet's billing Lincoln for leads actually delivered, which is referred to as "billing to actual." (ECF no. 55-4, Exh. L at 22:3 to :7, 30:16 to 31:16).

### ii. Monthly Invoices and the Client Services Agreement

Under the Client Services Agreement between Lincoln and CUnet, CUnet was required to "invoice Lincoln on a monthly basis for management fees based on the actual spend paid to 3rd party internet vendors" under the Agreement. (ECF no. 59-6, Exh. C). Accordingly, Malek issued monthly invoices to Lincoln for services rendered to Lincoln by CUnet. (DSMF ¶ 30).

### 3. Kancherla's Internal Complaints

Kancherla called Lincoln's Employee Assistance Program hotline on two occasions: in the fall of 2012 and on or about May 17, 2013.[5] (*Id.* at ¶ 131; ECF no. 55-6, Exh. U.)

### 4. Lincoln's Audit of CUnet

Internal audits of vendors are conducted on a quarterly basis. (DSMF ¶ 53). Jameson would select a single vendor in each quarter to audit for compliance. (*Id.*) In early May 2013, Jameson notified Lincoln's Marketing

---

[5] A report was generated concerning the May 2013 call. A copy of this report was submitted by Lincoln. *See* ECF no. 55-6, Exh. U. However, neither party has provided a copy of a report associated with the call Kancherla made in the fall of 2012. It is unclear whether such a report exists for that call.

Department that she would be conducting an internal audit of CUnet that quarter. (*Id.* at ¶ 52).

On May 29, 2013, Kancherla sent Malek an e-mail with the subject line "Ninja." (*Id.* at ¶ 54 (citing ECF no. 55-6, Exh. S)) The e-mail chain discussed CUnet's balance. (*Id.*)

### 5. Kancherla's FMLA Leave

Lincoln has a FMLA policy which allows eligible employees up to twelve weeks of unpaid family leave in a twelve-month period. (*Id.* at ¶ 44)(citing ECF no. 55-3, Exh. C at 31-33). Leave may be granted for "a serious health condition[6] that makes the employee unable to perform his/her job."[7] (*Id.*)(citing ECF no. 55-3, Exh. C at 31-33). On or about June 6, 2013, Kancherla contacted Lincoln's Benefits Department and requested FMLA leave due to his anxiety and depression.[8] (*Id.* at ¶ 47). Lincoln granted Kancherla's FMLA request, and sent him a letter asking him to complete and return a "Certification of Health Care Provider for Employee's Serious Health Condition" form. *See* (ECF no. 55-5, Exh. R).

Five days later, on June 11, 2013, Alava e-mailed Lincoln's Human Resources Department, asking how long Kancherla would be absent. (PSSMF ¶ 35)(citing ECF no. 61-3, Exh. M). Lincoln's Human Resources replied that "[p]er the Attending Physician's Statement", Kancherla's doctor estimated that

---

[6] The Employee Handbook defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that requires inpatient care or continuing medical treatment or supervision by a healthcare provider." (ECF no. 51-3, Exh. C at 32).

[7] As stated in the Employee Handbook, employees seeking to request FMLA leave must make requests "in writing, unless such notice is impossible, [thirty] days prior to the need for leave." (DSMF at ¶ 44). If a thirty-day notice is not possible, "the employee must provide notice as soon as practicable and generally must comply with Lincoln Educational Services' call-in procedure." (*Id.*) Upon applying for leave, an employee must "provide proof of placement or certification from the health care provider supporting the need for family/medical leave." (*Id.*)

[8] Kancherla did not communicate his leave of absence to Enea, Jameson, or Alava. (DSMF at ¶ 49).

Kancherla would be able to return to work on July 30, 2013. (*Id.*) Alava forwarded that e-mail to Jameson and Peter Tahinos. (*Id.*) The next day, Enea e-mailed Lincoln's Internet Marketing Team and the vendors who worked with Kancherla, informing them that Kancherla "'will be on short term, approved leave of absence from Lincoln until 7/30/13.'" (*Id.* at ¶ 36)(citing ECF no. 61-3, Exh. G).

### 6. Lincoln's Internal Investigation

After Kancherla took his FMLA leave, Enea notified Malek from CUnet that he would be the main point of contact while Kancherla was out. (DSMF ¶ 56)(citing ECF no. 55-4, Exh. L at 47:19 to 48:6). On or about June 21, 2013, Malek forwarded an e-mail chain to Enea which included e-mails between Malek and Kancherla regarding the June 2013 budget for CUnet. (*Id.* at ¶ 58)(citing ECF no. 59-6, Exh. E).

According to Malek, she had a conversation with Enea in which she informed Enea about Lincoln's "piggy bank." (*Id.* at ¶ 59) (quoting ECF no. 55-4, Exh. L at 52:7 to :24). Malek used the terms "piggy bank" and "ninja budget" interchangeably to describe a fund held by CUnet which included 1) extra money remaining from CUnet's practice of "billing to budget" rather than "billing to actual", and 2) money that CUnet had received from Lincoln to prepay CUnet for its services. (*Id.* at 23:1 to :4, 81:15 to :22). This fund was carried over on a month-to-month or quarterly basis. (ECF no. 55-4, Exh. L at 22:3 to :7). Malek testified that Enea "'sounded surprised. . . [either] because he just didn't know about it or he didn't know how much was in there at the time.'" (*Id.*)(citing ECF no. 55-4, Exh. L at 52:11 to :15).

At some point[9], Enea went to the office of his supervisor, Alava, and informed Alava about the "piggy bank." (*Id.* at ¶ 60)(citing ECF no. 55-4, Exh. K at 59:7 to :17). Alava and Enea subsequently had a conference call with Malek, who described the fund as a prepaid fund. (*Id.* at ¶¶ 60-61)(citing ECF no. 55-

---

[9]      The parties dispute the exact timing of when Enea alerted Alava. (DSMF ¶ 60);(RSMF ¶ 60); (DRRSMF ¶ 60).

4, Exh. K at 59:7 to :17, 13:13 to 14:2; ECF no. 55-3, Exh. I at 41:24 to 44:23; ECF no. 55-4 at 86:1 to :24). In their depositions, Kancherla, Enea, Alava, and Malek, essentially agreed that "when the actual services provided in a month totaled less than the purchase order amount, [Kancherla] would direct CUnet to 'bill to budget' and retain these excess monies in a 'ninja budget' or 'piggy bank' rather than return the money to Lincoln." (*Id.* at ¶62)(citing ECF no. 55-5, Exh. P at 146:11 to :21; ECF no. 55-4, Exh. K at 9:19 to :19, 59:21 to 60:22; ECF no. 55-3, Exh. I at 45:15 to :24; ECF no. 55-4, Exh. L at 25:5 to :21, 29:15 to 32:8, 78:3 to :20, 87:3 to :9).

Relying on information he learned from Malek, Enea testified that "'CUnet was invoicing for the exact amount of the purchase order [but] had not been delivering all of the leads that were promised according to the purchase order. Some of those monies were being set aside in a credit, in a fund.'" (*Id.* at ¶63)(quoting ECF no. 55-4, Exh. K at 60:17 to :22). Moreover, according to Malek, "[c]onversely, in the instance [Kancherla] directed her to 'bill to budget' and the invoiced amount was higher than the purchase order amount, [Kancherla] would direct Malek to take the residual amount from the 'piggy bank.'" (*Id.*)(citing ECF no. 55-4, Exh. L at 33:19 to :24; 78:3 to :20).

"Malek created a separate spreadsheet to monitor th[e]. . . 'piggy bank' maintained by CUnet." (*Id.* at ¶ 66)(citing ECF no. 55-3, Exh. I at 44:24 to 45:14). Malek's supervisor forwarded the spreadsheet to Enea and Alava. (*Id.* at ¶ 83)(citing ECF no. 55-4, Exh. K at 15:16 to 16:13, 63:11 to :23; Exh. L at 54:8 to :20). Alava then provided the data he received from CUnet to Jameson. (*Id.* at ¶ 84)(citing Exh. I, ECF no. 55-3 at 20:22 to 21:7, 39:9 to :13). Upon learning this information, Jameson directed Enea and Alava "[t]o go back and work with [Lincoln's] marketing analyst to investigate and audit the account to see what they. . . could find." (*Id.* at ¶ 85)(citing ECF no. 55-5, Exh. O at 28:11 to :16). Lincoln's Marketing Department then conducted an internal investigation. (*Id.* at ¶ 86)(citing ECF no. 55-5, Exh. O at 25:5 to :13). According to Jameson, Enea and Alava had a second meeting with her, where

they informed her that "'they had audited the purchase orders to the invoices, and that [Lincoln] had overpaid [CUnet], along with printouts of [Kancherla] currently working during his FMLA period.'" (*Id.*)(quoting ECF no. 55-5, Exh. O at 34:8 to :12).

Jameson testified that she then conveyed that information to Lincoln's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), and that the CFO instructed her to order Lincoln's Internal Audit Department to conduct an independent audit. (*Id.* at ¶¶ 89-90)(citing *id.* at 44:19 to 45:10, 45:24 to 46:3, 116:23 to 117:5). The Audit Department later orally informed Jameson that its investigation matched the Marketing Department's findings. (*Id.* at ¶ 92)(citing ECF no. 55-5, Exh. O at 59:3 to :7). Jameson informed Lincoln's CEO and CFO of the Audit Department's findings. (*Id.* at ¶ 93)(citing ECF no. 55-5, Exh. O at 60:1 to 61:16).

### 7. Lincoln's Decision to Terminate Kancherla

Based on the investigatory findings, Jameson recommended to Ace from Lincoln's Human Resources Department that Lincoln terminate Kancherla's employment. (*Id.* at ¶ 115)(citing ECF no. 55-5, Exh. O at 22:2 to 23:7, 61:17 to 62:10, 63:17 to :23, 98:2 to :6). Ace agreed with Jameson's recommendation. (*Id.*)

Thereafter, an internal termination transmittal form was signed by Alava on June 27, 2013, and signed by Jameson, Moore, and Ace on June 28, 2013. (ECF no. 55-3, Exh. F). As the "Reason for Termination," the form states the following:

> During a meeting on Monday, June 24, CUnet told Lincoln . . . that [Kancherla] had instructed them to invoice [Lincoln] amounts that were different from actual expenses that [Lincoln] incurred for the month, which is contrary to department procedure. They further shared that these requests had been ongoing for numerous months. A document provided by CUnet verified that [Lincoln] had been overpaying CUnet over a number of months and that [Kancherla] had signed the documents.
>
> *November 2012: [Lincoln] had a credit of $30,346.75 with CUnet.

11

*December 2012: [Lincoln] incurred $249,966.10 affiliate campaign costs but was invoiced an additional $105,182.81. Cumulative overpayment became $135,529.56.

*January 2013: [Lincoln] incurred $541,346.38 affiliate campaign costs but was invoiced an additional $42,251.65. Cumulative overpayment increased to $177,781.20.

*February 2013: [Lincoln] incurred $553,987.50 affiliate campaign costs but was invoiced an additional $9,645.03. Cumulative overpayment became $187,426.23.

*March 2013: [Lincoln] incurred $521,712.13 affiliate campaign costs but was invoiced an additional $36,756.89. Cumulative overpayment grew $224,183.12.

[Kancherla] did not share this information with his direct supervisor nor other Marketing executives. As a result of [Kancherla]'s instructions to CUnet, $224,183 were withheld from the department's efforts to achieve its Q1 objectives. As a result of these actions, [Kancherla] jeopardized [Lincoln's] business.

(*Id.*)

Kancherla received a letter of termination dated July 2, 2013, stating that his termination was effective June 28, 2013. (RSMF ¶¶ 2, 6, 119); (DRRSMF ¶ 6).

### C. Disputed Facts

Although much is in dispute between Kancherla and Lincoln, the disputes that are essential can be distilled to a few core issues.

#### 1. Violation of Lincoln's policies

First, the parties dispute one central legal issue: whether Kancherla was terminated for a legitimate non-discriminatory and non-retaliatory business reason, *i.e.,* violation of Lincoln's guidelines and policies regarding advance billing.

According to Lincoln, Kancherla was terminated for violating (i) Lincoln's Marketing Department Internal Control Review Summary; (ii) Lincoln's Integrity Assurance Program- Code of Business Ethics and Conduct; and (iii) Lincoln's General Conduct Guidelines. (DSMF ¶¶ 97-98)(citing ECF no. 55-5, Exh. O at 25:5 to :13, 57:2-6, 69:17 to 70:24, 104:5 to 106:25).

Kancherla disputes the existence of the "policies and procedures" that allegedly prohibited his actions with CUnet, and disputes Lincoln's

interpretation of the Client Services Agreement. (DSMF ¶ 37);(RSMF ¶¶ 37, 96, 98, 111)(citing ECF no. 61-2, Exh. C at 35:20 to 36:4, 61:7 to :18, 70:15 to 71:2, 72:23 to 73:25); (DRRSM ¶ 37). He also disputes Lincoln's denial that it knew of his allegedly prohibited actions. He adds that his management of CUnet including prepays and "billing to budget," merely continued the practices of his predecessor, Pela. (RSMF ¶¶ 70, 74, 107, 101, 110; PSSMF ¶¶ 4-6, 9, 14-31; DRSSMF ¶¶4-6, 9, 11, 14-31).

### i. Marketing Department Internal Control Review Summary

Lincoln alleges that Kancherla violated Control Number 4 of its 2012 Marketing Department Internal Control Review Summary (the "Review Summary"). That document, says Lincoln, required Kancherla "to evidence review and confirm services were performed." (*Id.* at ¶ 100)(citing ECF no. 55-5, Exh. O at 71:4 to :14, 85:2 to :19; ECF no. 59-6, Exh. D). In Lincoln's telling, the Review Summary was in place during Kancherla's tenure, and it dictated that employees were not permitted "to 'bill to budget' and retain these monies for future use." (DRRSMF ¶ 26; *see also* DRRSMF ¶ 32.)

Kancherla, on the other hand, asserts that when he was terminated, the Review Summary did not exist. Indeed, he says, Lincoln had no written policy regarding the purchase order and invoicing process. (RSMF ¶ 100)(citing ECF no. 61-2, Exh. C at 35:20 to 36:4). *See also* (PSSMF ¶ 26). In particular, "there was no written policy or procedure at Lincoln that prohibited directing a vendor to invoice for the amount of a purchase order, which was greater than the value of the services actually provided, and allowing the vendor to retain the overage in a prepaid account or fund." (PSSMF ¶ 27). Specifically addressing the "bill to budget" practice, Kancherla maintains that "[t]here was no written policy at Lincoln that prohibited Lincoln from requesting that CUnet 'bill to budget' and retain the amount above the actual services rendered in a credit or reserve fund to be used against services to be provided in the future." (RSMF ¶ 26)(citing ECF no. 61-2, Exh. C at 61:7 to :18, 70:15 to 71:2).

### ii. Lincoln's Integrity Assurance Program- Code of Business Ethics and Conduct

Lincoln alleges that Kancherla violated its Code of Business Ethics and Conduct. (DSMF ¶ 102). Kancherla disputes this and characterizes it as a legal argument, not a factual one for purposes of Rule 56.1. (RSMF ¶ 102).

### iii. Lincoln's General Conduct Guidelines

Lincoln alleges that Kancherla violated its General Conduct Guidelines, located in Lincoln's Employee Handbook, by "violat[ing] clear Lincoln policy which prohibited employees from directing or carrying over monies beyond quarters 'because [Lincoln] is a public company. . .'" (DSMF ¶ 103)(citing ECF no. 55-3, Exh. I at 28:14 to :17, 68:19 to :22). Kancherla disputes this and maintains that no such policy existed. (RSMF ¶ 103)(citing ECF no. 61-2, Exh. C at 72:23 to 73:25). *See also* (PSSMF ¶ 29).

Lincoln also alleges that it was not "permissible under Lincoln policy to bill Lincoln for 'prepays' for services not rendered in that month." (DSMF ¶ 105)(citing ECF no. 55-4, Exh. M at 39:14 to :18, 40:1 to :14). Kancherla disputes this and maintains no such policy existed at the time. (RSMF ¶ 105)(citing ECF no. 61-2, Exh. C at 61:7 to :18, 70:15 to 71:2).

### 2. Other disputed issues

Second, the parties dispute the content of Kancherla's calls to Lincoln's hotline, and whether those calls alleged discriminatory treatment by Enea. (DSMF ¶¶ 131-37; RSMF ¶¶ 131-37).

Third, the parties dispute when Kancherla was able to return to work. (DSMF ¶ 48)(citing ECF no. 55-5, Exh. Q); (RSMF ¶¶ 48, 51)(citing ECF no. 61-3, Exh. M); DRSSMF ¶ 34).

## II. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that the court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir.

2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Hayes v. Harvey*, 874 F.3d 98, 103 (3d Cir. 2017). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence supporting the non-moving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's cases, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter but to determine

whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. That "evidentiary burden" is discussed in the following sections.

## III.    Discussion

Lincoln moves for summary judgment on all claims in the Amended Complaint. In Section III.A, *infra*, I will consider Lincoln's motion as to Count 1, the FMLA retaliation and interference claims. In Section III.B, *infra*, I will consider Lincoln's motion as to Count 2, the NJLAD disability discrimination and retaliation claims. For the reasons discussed below, Lincoln's motion will be for the most part denied, but granted in part.

### A. FMLA Interference and Retaliation Claims (Count 1)

The FMLA provides, in relevant part, that eligible employees are entitled to 12 work weeks of leave during any 12–month period due to an employee's own "serious health condition[10] that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After this period of leave, an employee is entitled to be restored to his or her original position or its equivalent.[11] *Id.* § 2614(a)(1).

---

[10]    The term "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital... or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

[11]    However, as recognized by former Chief Judge Jerome B. Simandle, "this entitlement to restoration is a qualified one." *Morro v. DGMB Casino LLC*, 112 F. Supp. 3d 260, 281 (D.N.J. 2015). The FMLA does not entitle a restored employee to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

To protect those rights, Section 2615 of the FMLA prohibits an employer from engaging in certain acts. Section 2615(a)(1), known as the "interference" provision, provides that when an employee invokes his or her rights granted under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or attempt to exercise" those rights. 29 U.S.C. § 2615(a)(1). *See Callison v. City of Philadelphia,* 430 F.3d 117, 119 (3d Cir. 2005). Moreover, Section 2615(a)(2), known as the "retaliation" provision, states that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). *See Callison,* 430 F.3d at 119. Pursuant to Section 2617, an employee can bring a civil action against an employer who violates Section 2615. *See* 29 U.S.C. § 2617.

In Count 1 of the Amended Complaint, Kancherla alleges

**(1)** that Lincoln interfered with his attempt to exercise his rights under the FMLA by terminating his employment (AC ¶¶ 33-37), and

**(2)** that Lincoln retaliated against him for taking FMLA leave by terminating his employment. (*Id.*)

### 1. FMLA Interference Claim

Kancherla's FMLA interference claim and his retaliation claim are premised on the same allegation: that Lincoln wrongfully terminated him while he was out on FMLA leave. (*Id.*) Some cases have held that such facially duplicative interference and retaliation claims may not be pursued simultaneously. *See Kumar v. Johnson & Johnson, Inc.,* No. CIV.A. 12-779 MAS, 2014 WL 5512549, at *11 n.8 (D.N.J. Oct. 31, 2014); *Yamamoto v. Panasonic Corp. of N. Am.,* No. CIV.A. 12-2352 JLL, 2013 WL 3356214, at *10-11 (D.N.J. July 2, 2013); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 314 n.25 (3d Cir. 2012) (suggesting in dictum that redundant retaliation and interference claims may be dismissed). Others have suggested, in dictum, that a redundant claim need not necessarily be dismissed. *See*

*Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009); *see also Beese v. Meridian Health Sys., Inc.*, 629 F. App'x 218, 223 n.3 (3d Cir. 2015).

Here, retaliation is clearly the better fit, and the interference claim adds little if anything to the analysis. Kancherla appears to concede that his interference claim is redundant, and urges that the Court consider his FMLA claim to be one for retaliation. I will therefore grant Lincoln's motion for summary judgment to the extent of dismissing Count 1's interference claim under the FMLA. The substance of the action should be unaffected.

### 2. FMLA Retaliation Claim

#### i. Ability to Return to Work

Lincoln asserts that Kancherla's FMLA retaliation claim should be dismissed because Kancherla would have been unable to return to work at the conclusion of his twelve weeks of FMLA leave. (Def. Br. at 6 to 8). It relies on language from the Third Circuit's non-precedential 2002 opinion in *Katekovich v. Team Rent A Car of Pittsburgh, Inc.*, 36 F. App'x 688 (3d Cir. 2002). (*Id.* at 6 to 7). That Court stated that "if an employer terminates an employee during the twelve weeks [of FMLA leave] but the employee would not have been able to return to work at the end of the twelve weeks in any event, the employer has not violated the FMLA." 36 F. App'x at 690–91 (citing *Cehrs v. Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 784-85 (6th Cir. 1998)).

The parties agree that Kancherla's FMLA leave started on June 6, 2013, and that Kancherla was terminated about three weeks later, on June 28, 2013. (DSMF ¶ 47; RSMF ¶¶ 2, 6, 119, 47; DRRSMF ¶ 6). They dispute whether, if he had not been dismissed, Kancherla would have been able to return to work at the conclusion of his FMLA twelve-week leave on August 29, 2013.

Lincoln points to a U.S. Department of Labor FMLA Certification form from Kancherla's doctor, dated June 25, 2013 (about three days before Kancherla's dismissal). In that USDOL form, the doctor described the duration of Kancherla's condition as "indefinite." (Def. Reply at 5; ECF no. 55-5, Exh. Q). Thus, says Lincoln, the only information it had at the time indicated that

Kancherla would not be able to return. Lincoln also cites a New Jersey Department of Labor form completed by Kancherla's doctor much later, on October 29, 2013 (*i.e.,* almost five months after Kancherla's termination). (*See* ECF no. 55-6, Exh. X) According to Lincoln, the NJDOL form demonstrates that Kancherla would not have been fit to return to work until January 2, 2014, about three months after the expiration of his twelve weeks of FMLA leave. (Def. Br. 8 (citing DSMF ¶ 51); ECF no. 55-6, Exh. X).

Kancherla responds that, at the time of his termination, Lincoln did indeed have information that Kancherla would return to work *before* the end of his twelve-week FMLA period—specifically by July 30, 2013. (Pl. Br. 1 (citing PSSMF ¶ 35)). He cites a June 11, 2013 e-mail in which Lincoln's Human Resources Department confirmed to Alava that Kancherla's doctor estimated a return-to-work date of July 30, 2013.[12] *See* (PSSMF ¶ 35)(citing ECF no. 61-3, Exh. M). A New Jersey Department of Labor form completed by Kancherla's doctor on June 25, 2013 also indicates July 30, 2013 as an estimated return date. (ECF no. 55-6, Exh. X).[13]

Kancherla adds that his mental condition was "exacerbated" by the termination on June 28, 2013. Thus it was only after the termination that his doctor estimated that he would not be prepared to resume work until January 2014. (RSMF ¶ 123 (citing ECF no. 55-5, Exh. P at 114:21 to 115:9). Lincoln,

---

[12]     Lincoln asserts that under *Katekovich*, it is immaterial whether at the time of Kancherla's termination, it "had information" that Kancherla would return to work during the twelve-week FMLA period. (Def. Reply 4). In stating "but the employee would not have been able to return to work at the end of the twelve weeks in any event. . .", 36 F. App'x at 690, the *Katekovich* Court did not specify the exact contours of its conclusion. Moreover, post-*Katekovich* case law has not explicitly explained the relevance of an employer's knowledge or possession of information regarding an employee's date of return to work. Because I find that summary judgment is inappropriate given the genuine issue of material fact as to whether Kancherla was able to return to work at the end of his FMLA leave, I will reserve discussion of the issue.

[13]     Lincoln maintains that there is no evidence that it "received the certification submitted to the NJ Department of Labor" which indicated that Kancherla would return to work before the expiration of his FMLA leave. (Def. Reply at 5 to 6).

Kancherla says, did not receive any information that Kancherla would be unable to return to work within the FMLA period "until after it terminated his employment (and likely not until this litigation)." (Pl. Br. at 1 to 2)(citing *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 537 n.9 (D.N.J. 2008)).

There is a material issue of fact as to Kancherla's ability, or not, to return to work at the end of his FMLA leave, and whether Lincoln had contemporaneous information that would have justified its termination decision on that basis. Lincoln's motion for summary judgment on the Count 1 FMLA retaliation claim, insofar as it is based on inability to return to work, will therefore be denied.[14]

I therefore proceed to analyze the evidence of retaliation.

### ii. *McDonnell Douglas* Burden-Shifting Framework

FMLA retaliation claims based on circumstantial evidence are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[15] *Lichtenstein*, 691 F.3d at 302. In this case, Kancherla's claim is based on circumstantial evidence. Accordingly, to succeed on his claim, he has the initial burden of establishing the *prima facie* case. *Id.* If he is able to make this showing, the burden of production shifts to Lincoln to "articulate some legitimate, non-discriminatory reason" for its decision. *Id.*

---

[14]    In *Cehrs*, the Sixth Circuit opinion cited by *Katekovich*, it was undisputed that the plaintiff was unable to return to work on the day her FMLA leave would have ended. 155 F.3d at 778. Similarly, in *Katekovich*, the employee had not presented evidence that she could return to work within twelve weeks. 36 F. App'x at 691. In *Morro v. DGMB Casino LLC*, 112 F. Supp. 3d 260 (D.N.J. 2015), cited by Lincoln, it was likewise undisputed that the employees was unable to return to work after the twelve weeks of FMLA leave. 112 F. Supp. 3d at 281 (stating ". . . nothing in the record supports that [the plaintiff-employee] would have been able to return to work in July, once her twelve weeks of FMLA leave were exhausted. Nor does Plaintiff argue otherwise."). *See also Smith v. UBS Fin. Servs., Inc.*, 2006 U.S. Dist. LEXIS 70551, *2-3 (D.N.J. 2006) (undisputed that plaintiff was unable to return to work until nearly two months after his FMLA leave expired).

[15]    In contrast, claims relying on direct evidence of retaliation use the less taxing mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 276-77 (1989).

(quoting *McDonnell Douglas*, 411 U.S. at 802). If Lincoln meets this "minimal burden", Kancherla must then point to some direct or circumstantial evidence from which a fact finder could "reasonably ... disbelieve [Lincoln's] articulated legitimate reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Lincoln's motion here focuses on the first *McDonnell Douglas* element. Lincoln argues that Kancherla has not met his initial burden of establishing a *prima facie* case of retaliation sufficient to shift the burden to Lincoln to justify the dismissal.

### a) Kancherla's *prima facie* case of retaliation

To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must prove that: (1) he invoked his right to FMLA benefits; (2) he suffered an adverse employment action; and (3) adverse employment action was causally related to his invocation of FMLA rights. *Lichtenstein*, 691 F.3d at 302; *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004). As noted above, the *prima facie* burden is fairly minimal. Lincoln challenges the second and third *prima facie* elements, arguing that Kancherla's termination was not an "adverse employment action," and was not "causally related" to his invocation of FMLA rights. (Def. Br. 11 to 15). Reading the record in the light most favorable to Kancherla, I must reject Lincoln's contentions and find sufficient evidence to support a *prima facie* case of retaliation.

The first element is not contested. Kancherla took leave under the FMLA.

Regarding the second element, in the context of FMLA retaliation, an adverse employment action must be one that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). The Third Circuit has not yet decided whether the FMLA analysis should incorporate the lower standard for "adverse employment action" that

the Supreme Court has adopted in Title VII retaliation claims. *Id.* at 257 n.6 (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)). Under the more relaxed *Burlington* standard, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse,' such that the action well might have dissuaded a reasonable worker from taking a protected action." *Id.* (quoting *Burlington*, 548 U.S. at 68). Here, however, the "adverse action" is dismissal, *i.e.,* firing, which is adverse in anybody's book. Thus the precise standard probably does not matter here.[16]

 Lincoln asks this Court to read into the "adverse action" element a requirement that "'[i]n order to show that termination was adverse, Plaintiff needs to present evidence indicating that … [he] could have performed … [his] job duties at the time of … [his] termination.'" (Def. Br. 11 to 12)(quoting *Smith*, 2006 WL 2668203, at \*3 (quoting *Dogmanits v. Capital Blue Cross,* 413 F. Supp. 2d 452, 462 (E.D. Pa. 2005)(citing *Alifano v. Merck & Co., Inc.,* 175 F. Supp. 2d 792, 795 (E.D. Pa. 2001)). Lincoln's argument is not wholly without support. Some courts in our Circuit have indeed held that in order to show an adverse employment decision, a plaintiff needs to present evidence indicating that he could have performed his job duties at the time of his termination. *See Smith*, 2006 WL 2668203, at \*3; *Dogmanits*, 413 F. Supp. 2d at 463; *Alifano*, 175 F. Supp. 2d at 795. (Actually, the issue must be Kancherla's ability to

---

[16] As Judge Kugler has noted, "[w]hile the Third Circuit has never squarely held that this 'materially adverse' standard applies in the context of an FMLA retaliation claim, it has suggested that, were it necessary to address the issue, it would so hold." *Incorvati v. Best Buy Co.*, 2013 WL 3283956, at \*4 (D.N.J. June 27, 2013) (citing *Kasper v. County of Bucks*, No. 12–2504, 2013 WL 563342 at \*5 (3d Cir. Feb. 15, 2013) (assuming, "*arguendo*, that the *Burlington* … standard applies in the FMLA context"); *DiCampli v. Korman Communities*, 257 F. App'x 497, 500–01 (3d Cir. 2007) (applying the *Burlington* standard to an FMLA claim without further discussion)). Most recently, in *Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 36 n.14 (3d Cir. 2017), the Third Circuit noted that the District Court should have applied the *Burlington* standard to plaintiff's retaliation claims under the Americans with Disabilities Act ("ADA"), the FMLA, and the Pennsylvania Human Relations Act ("PHRA"). Called upon to decide the issue, I would make the plaintiff-friendly assumption that the *Burlington* standard applies, and analyze Kancherla's retaliation claim under that standard.

return at the *end* of the FMLA period, not his ability to return *during* that period, which is when the dismissal occurred.) However, other courts in this Circuit have declined to follow suit, and I am persuaded by that authority.[17] At any rate, for the reasons stated above, Kancherla's ability to return to work is a disputed factual issue.

Here, Kancherla alleges that his taking FMLA leave resulted in the termination of his employment with Lincoln. It is undisputed that Kancherla was terminated while out on FMLA leave. Being fired is surely an "adverse employment action." I find that Kancherla's termination satisfies the *Burlington* standard, and that the second element of the *prima facie* case of retaliation under the FMLA is satisfied.

---

[17]    *See McDonald v. SEIU Healthcare Pennsylvania*, No. 1:13-CV-2555, 2014 WL 4672493, at *17 (M.D. Pa. Sept. 18, 2014)("[a]pplying the *ratio decidendi* of *Budhun*" and rejecting defendants' claim that the plaintiff's "inability to return to work after her FMLA leave, standing alone, render[ed] her termination nonadverse for the purposes of her retaliation claim."); *Donald v. Se. Pennsylvania Transp. Auth.*, No. CIV.A. 13-0440, 2014 WL 3746520, at *6 (E.D. Pa. July 29, 2014)(concluding that plaintiff's termination constituted an adverse employment action in the context of a prima facie case of retaliation under the FMLA); *Fleck v. WILMAC Corp.*, No. CIV.A. 10-05562, 2011 WL 1899198, at *9 (E.D. Pa. May 19, 2011)("choos[ing] not to follow *Alifano's* line of reasoning. . . as it appears to conflate the FMLA's prescriptive right to restatement and proscriptive right against retaliation."); *Castellani v. Bucks Cty. Municipality*, No. CIV.A.07-1198, 2008 WL 3984064, at *6 (E.D. Pa. Aug. 27, 2008), *aff'd*, 351 F. App'x 774 (3d Cir. 2009)(holding that because there was no dispute that plaintiff took FMLA leave and was subsequently discharged from employment, plaintiff had satisfied the first two elements of a prima facie case of retaliation, and recognizing that other courts have noted that *Smith, Dogmanits*, and *Alifano* "conflate the regulations applicable to interference and retaliation claims under the FMLA in holding that a plaintiff's inability to return to work precludes finding an adverse action for purposes of a retaliation claim."); *Chapman v. UPMC Health Sys.*, 516 F. Supp. 2d 506, 524 n.4 (W.D. Pa. 2007) (rejecting defendant's reliance on *Dogmanits* and concluding that termination from employment qualifies as an adverse employment action in an FMLA retaliation case); *Keim v. Nat'l R.R. Passenger Corp.*, No. CIV.A. 05-CV-4338, 2007 WL 2155656, at *7 n.6 (E.D. Pa. July 26, 2007)(stating that *Dogmanits* and *Alifano* "rely on case law and language from substantive FMLA cases and appear to conflate the proscriptive and prescriptive inquiries").

With respect to the third element of the prima facie case for FMLA retaliation, according to Lincoln, the temporal proximity between Kancherla's request for FMLA leave and Lincoln's termination of Kancherla is insufficient to create an inference of causation. (Def. Br. 14 to 15). Kancherla, on the other hand, maintains that his termination less than three weeks into his FMLA leave is "unduly suggestive" timing that establishes a causal connection between his request for FMLA leave and his termination. (Pl. Opp. 7 to 10).

The Third Circuit has cautioned that in determining whether a causal link exists between the protected activities and a plaintiff's termination, courts should turn "a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000). "To demonstrate a causal connection, a plaintiff generally must show 'either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.'" *Budhun*, 765 F.3d at 258 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)(holding that "[w]here the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment.").

Although the Third Circuit has been "reluctant to infer a causal connection based on temporal proximity alone," the standard for "unusually suggestive" temporal proximity at the *prima facie* stage is not a high one. *Budhun*, 765 F.3d at 258 (citing *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001)). In one case, the Third Circuit treated the plaintiff's termination three months after requesting FMLA leave, on the day she was scheduled to return to work, as sufficiently suggestive. *Id.* at 258 (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007)). *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3d Cir. 2000) (finding that time of three to four weeks

24

between protected activity and termination was "suggestive" of retaliation in Title VII retaliation context). And "proximity" is not really the operative concept when, as here, the termination was simultaneous, *i.e.,* when it occurred *during* the FMLA leave.

In this case, on June 6, 2013, Kancherla informed Lincoln of his intention to take FMLA leave. (DSMF ¶ 47). About three weeks later on June 28, 2013, while Kancherla was still out on leave and had approximately 9 weeks of FMLA leave remaining, Lincoln terminated Kancherla. (RSMF ¶¶ 2, 6, 119; DRRSMF ¶ 6). Reinforcing Kancherla's temporal-proximity argument is his additional evidence that Lincoln's claims that he violated existing policy were pretextual. The causation element of a *prima facie* case is therefore satisfied.

At this summary judgment stage, viewing the facts in the light most favorable to the plaintiff, I find that Kancherla has satisfied his "minimal" burden of establishing a *prima facie* case for his FMLA retaliation claim.

### b) Lincoln's legitimate non-discriminatory reason for dismissal and Kancherla's proof of pretext

The parties do not focus on the second and third elements of the *McDonnell Douglas* burden-shifting analysis: Lincoln's proof of a legitimate non-discriminatory reason for dismissal, and Kancherla's responding proof that the proffered reason was a pretext. I nevertheless discuss them.

Lincoln proffers that Kancherla's termination was based on his violation of Lincoln's policies and procedures, specifically (1) Control 4 of Lincoln's Marketing Department Internal Controls Summary, (2) Lincoln's IAP – Code of Business Conduct, (3) Lincoln's General Conduct Guidelines, and 4) the Client Agreement Services Agreement between CUnet and Lincoln. (DSMF ¶¶ 96-118). That citation of evidence would satisfy Lincoln's fairly minimal burden of production at the second step of the *McDonnell Douglas* analysis. *See Lichtenstein,* 691 F.3d at 302 (stating that defendant's burden is minimal).

At the third step, the burden would shift to Kancherla to demonstrate that Lincoln's stated reason is merely pretext for discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). The plaintiff can do that in either of two ways: (1) he can discredit defendant's proffered reason; or (2) he can offer evidence that discrimination was more likely than not a motivating or determinative factor in the adverse action. *Fuentes*, 32 F.3d at 764. To meet that burden, the plaintiff may rely on direct or circumstantial evidence.

If the plaintiff relies on the first method (discrediting the defendant's proffered reasons), he faces a demanding standard: he must present evidence that allows a factfinder "reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999) (internal quotations omitted).

If the plaintiff relies on the second method (evidence that discrimination was a motivating factor), he can provide the required evidence in at least three ways: "by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

Here, Kancherla does not dispute that he engaged in the alleged misconduct, *i.e.,* the advance billing on the CUnet account. He raises a triable issue, however, as to whether Lincoln truly had a policy in place prohibiting such conduct, and whether it was the true reason for his dismissal.

Specifically, he maintains that at the time of his termination, 1) Lincoln's 2012 Marketing Department Internal Controls Summary was not in place; 2) "there was no written policy or procedure that prohibited directing a vendor to invoice for the amount of a purchase order, which was greater than the value of the services actually provided, and allowing the vendor to retain the overage in a prepaid account or fund", and 3) "there was no written policy or procedure at Lincoln that prohibited carrying credits or prepaid amounts with a vendor from one quarter to another." (Pl. Brf. 14 to 15 (citing PSSMF ¶¶ 26, 27, 29)).

Kancherla also asserts that it was common practice for Lincoln to direct CUnet, and other third-party vendors, to retain Lincoln's money for future endeavors. Lincoln's Marketing Department, he says, was aware of how he dealt with the CUnet account. (*Id.* at 15 to 19 (citing PSSMF ¶¶ 4, 6, 9, 11, 30; ECF no. 61-2, Exh. D at 33:15 to :19).

This evidence is summarized in more detail at Section I.C, *supra*. My role here is not to evaluate the credibility of that evidence but only to determine whether it genuinely places relevant facts in issue. *Anderson*, 477 U.S. at 248-49. Viewing the record and drawing all reasonable inferences in the light most favorable to Kancherla, I find there is a genuine issue of material fact as to whether Lincoln's proffered reasons for its decision to terminate Kancherla were the true reasons, or whether they were a pretext for retaliation on the basis of his exercise of his rights under the FMLA.

I will therefore deny Lincoln's summary judgment motion on the claim of FMLA retaliation in Count 1.

### B. NJLAD Disability Discrimination and Retaliation Claims (Count 2)

"The NJLAD prohibits unlawful discrimination against an individual with respect to terms and conditions of employment because of various traits and characteristics, including, but not limited to, race, religion, age, sex and disability." *Davis v. Supervalu, Inc.,* CIV. 13–414 JBS/JS, 2013 WL 1704295, at *4 (D.N.J. Apr.19, 2013) (citing N.J.S.A. 10:5–12(a)). The NJLAD also makes it unlawful to 1) "take reprisals against any person because that person has

opposed any practices or acts forbidden under" the act or "because he has filed a complaint, testified or assisted in a proceeding" under the Act, or 2) "coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of. . . any right granted or protected" by the Act. N.J.S.A. 10:5–12(d).

In Count 2 of the Amended Complaint, Kancherla alleges that Lincoln violated the NJLAD by 1) terminating his employment because of his disability, 2) failing to provide him with a reasonable accommodation, and 3) failing and refusing to engage in the interactive process with him. (AC ¶ 42). He further alleges that Lincoln retaliated against him for taking his disability leave by terminating his employment. (*Id.*)

The parties' arguments on summary judgment focus on Kancherla's NJLAD discriminatory discharge claim and retaliation claim. I will therefore limit my discussion of Count 2 to those claims. In Section III.B.1, *infra*, I will consider Lincoln's motion as to Kancherla's NJLAD discriminatory discharge claim, and in Section III.B.2, *infra*, I will consider Lincoln's motion as to Kancherla's NJLAD retaliation claim.

### 1. NJLAD Discriminatory Discharge Claim

Under the NJLAD, to establish a *prima facie* case of disability discrimination for discriminatory discharge, a plaintiff must demonstrate that: "(1) [he] is the member of a protected class, specifically that [he] has or is perceived to have a disability as defined by the NJLAD; (2) [he] was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation by the employer; (3) [he] experienced an adverse employment action; and (4) the employer sought someone else to perform the same work, or did fill the position with a similarly-qualified person."[18]

---

[18]     Lincoln erroneously maintains that under the NJLAD, to establish a *prima facie* case of disability discrimination for discriminatory discharge, Kancherla must prove that the "(a) he was disabled within the meaning of the law; (b) he was performing in the position from which he was terminated; (c) he suffered an adverse employment action; and (d) the adverse employment action occurred under 'circumstances that give rise to an inference of discrimination.'" (Def. Br. 17)(citing *Zive v. Stanley Roberts,*

28

*Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016)(footnote omitted)(citing *Victor v. State*, 203 N.J. 383, 409 (2010)). "Satisfaction of all four elements of a *prima facie* case creates a presumption of discrimination." *Id.* (citing *Andersen v. Exxon Co., U.S.A.,* 89 N.J. 483, 492-93 (1982)). Once the elements of a *prima facie* case are satisfied, as for a FMLA retaliation claim, the NJLAD claim will proceed within the *McDonnell Douglas* framework. *Id.* (citing *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 13 (2002); *Andersen*, 89 N.J. at 493).

In the particular context of a disability discrimination claim, the New Jersey Supreme Court has emphasized that "[d]isability discrimination claims are different from other kinds of discrimination claims, for several reasons":

> [t]hat is, for claims of disability discrimination, the first element of the prima facie case, that plaintiff is in a protected class, requires plaintiff to demonstrate that he or she qualifies as an individual with a disability, or who is perceived as having a disability, as that has been defined by statute. The second element requires plaintiff to demonstrate that he or she is qualified to perform the essential functions of the job, or was performing those essential functions, either with or without a reasonable accommodation.

*Id.* at 410 (footnote omitted).[19]

---

*Inc.*, 182 N.J. 436, 457-58 (2005); *Cuozzo v. Davis-Standard, LLC*, 2012 U.S. Dist. LEXIS 33659, at *9 (D.N.J. March 13, 2012); *Victor*, 203 N.J. at 409-10).

It maintains that Kancherla cannot establish element (d) because Kancherla has "not identified any comments or conduct suggesting a discriminatory animus." (Def. Br. 18) Lincoln's arguments do not relate to an element required to establish the *prima facie* case, the issue here.

[19] The NJLAD defines "disability" thus:

> physical or sensory disability, infirmity, malformation, or disfigurement which is caused by bodily injury, birth defect, or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impairment, deafness or hearing impairment, muteness or speech impairment, or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological, or developmental disability, including autism spectrum disorders, resulting from anatomical, psychological, physiological, or neurological conditions which prevents the typical exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by

### i. Kancherla's *prima facie* case of discriminatory discharge

In the context of a *prima facie* case of discriminatory discharge, Lincoln does not really address the first, second, and fourth elements, *i.e.,* membership in a protected class, qualifications for the job, or whether it filled the position with a similarly qualified person. Rather, Lincoln challenges the third element, an "adverse employment action." (Def. Br. 17 to 18). It reiterates its argument, initially presented as to Kancherla's FMLA retaliation claim, that Kancherla's termination was not adverse because Kancherla was unable to return to work after his FMLA leave. (*Id.* at 17 (citing Point I(D)(i) of Def. Br.). In the context of FMLA retaliation, that argument failed, *see* Section III.A.2.i, *supra*. For similar reasons, the argument fails in the NJLAD context.

The NJLAD does not define "adverse employment action," but "[a]n adverse employment action is easily satisfied by evidence of a failure to hire or by a firing." *Victor v. State*, 401 N.J. Super. 596, 615 (App. Div. 2008), *aff'd as modified*, 203 N.J. 383 (2010). Accordingly, I find that Kancherla's termination satisfies the "adverse action" element of the *prima facie* case of discriminatory discharge under the NJLAD. Furthermore, because Lincoln does not dispute Kancherla's satisfaction of the other elements of the *prima facie* case, I conclude that Kancherla has met his burden of establishing a *prima facie* case for his NJLAD discriminatory discharge claim.

### ii. Lincoln's legitimate non-discriminatory reason for dismissal and Kancherla's proof of pretext

In the context of Count 2, the NJLAD discriminatory discharge claim, Lincoln's argument are confined to Kancherla's alleged inability to establish a *prima facie* case of discrimination; Lincoln does not address steps two and

---

accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.

N.J. Stat. Ann. § 10:5-5(q).

three of the *McDonnell Douglas* framework. I therefore address them only briefly.

For the same reasons stated in section III.A.2.ii.b, *supra*, I find that Lincoln has satisfied its burden of production by providing a non-retaliatory explanation for Kancherla's termination.[20]

As discussed in section III.A.2.ii.b, *supra*, however, viewing the record and drawing all reasonable inferences in the light most favorable to Kancherla, I find that there is a genuine issue of material fact as to whether Lincoln's proffered reasons for its decision to terminate Kancherla were a pretext for discrimination.

I will therefore deny Lincoln's motion for summary judgment on Kancherla's NJLAD disability discrimination claim in Count 2.

### 2. NJLAD Retaliation Claim

I move to the component of Count 2 that alleges retaliation for Kancherla's exercise of rights under the NJLAD.

To establish a retaliation claim under the NJLAD, a plaintiff must demonstrate "(1) that [he] engaged in a protected activity; (2) that [he] suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action." *Davis v. City of Newark,* 417 F. App'x 201, 202 (3d Cir. 2011). Retaliation claims under the NJLAD are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *Bertolotti v. AutoZone, Inc.,* 132 F. Supp. 3d 590, 605 (D.N.J. 2015). Accordingly, once a *prima facie* case for retaliation is established, the burden of production shifts to the employer to articulate a legitimate reason for the adverse employment action. *Woods–Pirozzi v. Nabisco Foods,* 290 N.J. Super. 252, 274 (App. Div. 1996) (citation omitted). "Plaintiff must then show that a retaliatory intent, not the proffered reason, motivated defendant's actions." *Id.*

---

[20] I assume that Lincoln would proffer the same legitimate non-discriminatory reason for terminating Kancherla that it provided in the context of Kancherla's FMLA retaliation claim.

As to the *prima facie* case, Lincoln reiterates an argument it made in the context of Kancherla's FMLA retaliation claim. It challenges the third *prima facie* element, arguing that Kancherla is unable to establish that his termination was causally related to his invocation of FMLA rights. (Def. Br. 21)(citing Point I(D)(i) of Def. Br.). I reject this argument for the reasons set forth in section III.A.2.ii.a, *supra*.

As stated in section III.A.2.ii.b, *supra*, Lincoln has satisfied its burden of production by providing a non-retaliatory explanation for Kancherla's termination.[21]

As discussed in section III.A.2.ii.b, *supra*, viewing the record and drawing all reasonable inferences in the light most favorable to Kancherla, there is a genuine issue of material fact as to whether Lincoln's proffered reasons for its decision to terminate Kancherla are a pretext for discrimination.

I will therefore deny Lincoln's motion for summary judgment on Kancherla's NJLAD retaliation claim in Count 2.

### C. Compensatory Damages and the After-Acquired Evidence Doctrine

Kancherla seeks compensatory damages on his FMLA[22] and NJLAD claims. (*See* AC, Count 1, Prayer for Relief, A.; Count 2, Prayer for Relief, A. and B.). Lincoln argues that if this Court does not grant its motion for summary judgment, it should apply the after-acquired evidence doctrine and

---

[21]     I assume that Lincoln would provide the same legitimate non-discriminatory reason for terminating Kancherla that it provided in the context of Kancherla's FMLA retaliation claim.

[22]     In the Prayer for Relief of his FMLA claim, Kancherla does not use the specific phrase "compensatory damages," but his Amended Complaint states that he seeks "damages pursuant to 29 U.S.C. §2617 (a)(1)(A)(i)." (AC, Count 1, Prayer for Relief, A.). That section of the FMLA specifically allows recovery of compensatory damages for any wages, salary, employment benefits, or other compensation lost by reason of the violation. *See* 29 U.S.C. § 2617(a)(1)(A). For the purposes of my consideration of this motion, I will consider that Kancherla is seeking recovery of compensatory damages of the type specified in the FMLA.

limit the scope of compensatory damages that Kancherla may recover. (Def. Br. 37 to 39).

Lincoln submits a copy of Kancherla's 2009 employment application, in which he stated that he concluded his prior employment with Garden State Apartments, LLC ("GSA") in January 2009. (ECF no. 55-3, Exh. G). According to Lincoln, during its internal audit, it learned that Kancherla "knowingly concealed" his ownership interest in GSA, and continued employment with GSA during his tenure with Lincoln. (*Id.* at 37 to 38 (citing DSMF ¶¶ 86 to 88, 151 to 164)). The application "expressly provide[s] for termination in the instance any information [is] found to be 'false, misleading, or incomplete in any respect.'" (*Id.* at 38 (citing DSMF ¶¶ 151 to 157)). Kancherla, however, argues that 1) he did not engage in misrepresentation or falsification on his employment application, 2) during the interview process, he orally informed Lincoln about his outside employment, 3) Lincoln was aware of his outside employment and consulting activities during his employment, and 4) Lincoln admitted that those activities would not have been a reason for his termination if they did not present a conflict of interest. (Pl. Br. 22 to 26)(citing PSSMF ¶¶ 38-43, 47 to 48; ECF no. 61-2, Exh. C at 82:24 to 83:13, 84:7 to 85:5; ECF no. 61-2, Exh. A at 67:1 to 92:20).

"Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee *in fact* would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 362–63 (1995)(emphasis added). At this, the summary judgment stage, I find that there are genuine issues of material fact as to the application of the after-acquired evidence doctrine. I cannot use it to preclude the claim for compensatory damages. The issue remains open for determination at trial, if necessary.

### D. Punitive Damages

Kancherla seeks, in part, punitive damages on his FMLA and NJLAD claims. (AC, Count 1, Prayer for Relief, F.; Count 2, Prayer for Relief, C.). Lincoln argues that if this Court does not grant summary judgment on those counts, it should strike the demand or limit Kancherla's damages. (Def. Br. 39 to 40).

Lincoln first asserts that Kancherla's prayer for punitive damages under NJLAD should be stricken because there is no evidence of egregious conduct. (*Id.* at 39 (citing *Rendine v. Pantzer*, 141 N.J. 292, 313-14 (1995); *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 124 (3d Cir. 1999)). Second, it argues that punitive damages are not available under the FMLA, and therefore, Kancherla is not entitled to such damages for his FMLA-related claims. (*Id.* (citing *Zawadowicz v. CVS. Corp.*, 99 F. Supp. 2d 518, 540 (D.N.J. 2000)).

To recover punitive damages pursuant to the NJLAD, the New Jersey Supreme Court has established two prerequisites: the offending conduct must be "especially egregious;" and there must be "actual participation in or willful indifference to the wrongful conduct on the part of upper management." *Rendine*, 141 N.J. at 314. The *Rendine* Court further noted:

> [t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act.

*Id.* (citations omitted).

It is well-established that "[t]he issue of punitive damages is a fact question which should be decided by a jury." *Domm v. Jersey Printing Co., Inc.*, 871 F.Supp. 732, 739 (D.N.J. 1994); *see also Weiss v. Parker Hannifan Corp.*, 747 F.Supp. 1118, 1135 (D.N.J. 1990) ("[T]he decision whether to award punitive damages is solely within the discretion of the finder of fact, and it may choose to deny punitive damages even though intentional or malicious behavior is evident.")

Kancherla concedes, however, that punitive damages are not available under the FMLA as a matter of law. *See* Pl. Brf. 26. I will strike Kancherla's demand for punitive damages in Count 1. *See Zawadowicz*, 99 F. Supp. 2d at 540. As for punitive damages under the NJLAD, I agree with Kancherla that this fact-sensitive issue is not suitable for resolution on summary judgment. The motion is denied without prejudice to renewal at the close of Kancherla's case or at the close of all the evidence.

### E. Backpay

Kancherla also seeks, in part, compensatory damages on his NJLAD count "in the form of back pay, front pay, and compensation for lost benefits[.]" (AC, Count 2, Prayer for Relief, A.). Lincoln maintains that Kancherla is not "entitled" to back pay for June 6, 2013 through January 2, 2014 because he was unable to work during that time. (Def. Br. 39 to 40 (citing *Brum v. Extreme Builders*, 2010 U.S. Dist. LEXIS 57294, *6 (D.N.J. June 9, 2010)(report and recommendation of Magistrate Judge)).

Back pay under the NJLAD is among the forms of "equitable damages" available to the aggrieved. *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 617 (1993). *See also* N.J. Stat. Ann. § 10:5-13 (stating, in part, "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs. These remedies are in addition to any provided by this act or any other statute."). The New Jersey Supreme Court has recognized that "[t]he basic purpose of awarding back pay is to make the discriminatee whole by reimbursement of the economic loss suffered, though it also should correlatively discourage and deter unlawful discrimination." *Goodman v. London Metals Exch., Inc.*, 86 N.J. 19, 34–35 (1981). Ordinarily back pay accrues from the date of discharge to the date of the decision and is reduced by interim earnings. *Id.* at 34.

At this early stage, I will not consider whether Kancherla can recover back pay for the period of June 6, 2013 through January 2, 2014. I have already found that the date Kancherla could have returned to work is in

dispute on this record. Should Kancherla prevail on an NJLAD claim, he might be entitled to back pay for some period. That issue will be determined with the benefit of a factual record and fact finding; it is not ripe for decision now. *See Gilmore v. Macy's Retail Holdings*, 2009 WL 305073 (D.N.J. 2009) (finding that the jury should determine liability and compensatory damages under NJLAD, after which the Court would decide whether to award the equitable remedy of back pay).[23]

The motion for summary judgment as to back pay pursuant to the NJLAD is denied, without prejudice to renewal of these contentions at or after trial.

## IV. Conclusion

For the foregoing reasons, Lincoln's motion for summary judgment (ECF no. 55) is for the most part denied, but granted in part. The motion for summary judgment is granted for Lincoln as to Count 1, to the extent it asserts an interference claim under the FMLA. The motion for summary judgment is otherwise denied. Lincoln has not carried its burden of showing that no genuine issue of material fact exists. Triable issues of material fact remain.

I grant Lincoln's request to strike Kancherla's demand for punitive damages under the FMLA.

An Order will be entered in accordance with this Opinion.

Dated:  February 15, 2018

**Hon. Kevin McNulty**
**United States District Judge**

---

[23]    *Brum, supra,* relied upon by Lincoln, does not address back pay in the context of NJLAD.